UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

FOR ONLINE PUBLICATION ONLY

ALAN SALAZAR,

        Plaintiff,

- versus -

FERRARA BROTHERS BUILDING
MATERIALS CORP., JOSEPH FERRARA
and LEONARDO ANNUNZIATA,
individually,

        Defendants.

MEMORANDUM AND ORDER

13-CV-3038 (JG) (VMS)

A P P E A R A N C E S :

  McKINLEY ONUA & ASSOCIATES
    26 Court Street, Suite 300
    Brooklyn, New York 11242
  By: Gregory P. Mouton, Jr.
    *Attorneys for Plaintiff*

  CLIFTON BUDD & DeMARIA, LLP
    The Empire State Building
    350 Fifth Avenue, 61st Floor
    New York, New York 10118
  By: Arthur J. Robb
    Daniel H. Rowoth
    *Attorneys for Defendants*

JOHN GLEESON, United States District Judge:

    In this action, plaintiff Alan Salazar asserts claims for employment discrimination on the basis of race, in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq.* ("Title VII"), the New York State Human Rights Law ("NYSHRL"), the New York City Human Rights Law ("NYCHRL"), and malicious prosecution. Defendants Ferrara Brothers Building Materials Corporation ("Ferrara Brothers"), Joseph Ferrara, and Leonardo Annunziata move for summary judgment. Salazar filed his complaint on May 23,

2013. Salazar Aff. Ex. 1 (Complaint). Defendants filed their motion for summary judgment on January 9, 2015. I heard oral argument on March 26, 2015.

For the reasons stated below, the motion for summary judgment is denied as to the Title VII claims against the Ferrara Brothers and granted as to the Title VII claims against the individual defendants. Defendants' motion is denied as to the NYSHRL claims against Ferrara Brothers and Joseph Ferrara, and granted with respect to the NYSHRL claim against Annunziata. Defendants' motion as to Salazar's NYCHRL claims is denied. Finally, defendants' motion as to Salazar's malicious prosecution claims is granted.

## BACKGROUND

A.  *Factual Background*

Unless otherwise noted, the following facts are not in dispute.

1.  *Salazar's Employment with Ferrara Brothers*

Plaintiff Alan Salazar worked as a driver at Ferrara Brothers from October 2006 until March 12, 2012.[1] Def. Rule 56.1 Stmt. ¶ 3; Pl. Rule 56.1 Stmt. ¶ 3. Ferrara Brothers is one of New York City's largest concrete supply companies, and it employed over 100 workers during Salazar's employment. Def. Rule 56.1 Stmt. ¶¶ 1-2; Salazar Aff. ¶ 3. Defendant Joseph Ferrara is Vice President of Ferrara Brothers. Def. Ex. C (Joseph Ferrara Aff.) ¶ 1. Brian Ferrara is the Operations Manager. Def. Ex. D (Brian Ferrara Aff.) ¶ 1. Salazar was a member of a labor union, Teamsters Local 282 (the "Union"), which meant that the terms and conditions of his employment were covered by a collective bargaining agreement ("CBA") between the Union and Ferrara Brothers. Def. Rule 56.1 Stmt. ¶ 5. The CBA contains a grievance and arbitration procedure and has a non-discrimination policy. *Id*.

---

[1]  The defendants say that Salazar began employment in 2007, but Salazar contends it was October 2006.

Salazar alleges that he reported complaints about discriminatory treatment to Annunziata, who would convey them to the Ferraras. Pl. Rule 56.1 Stmt. ¶ 6. Salazar says this was the "mechanism available to him" for complaints. *Id*. To report discriminatory conduct by Annunziata himself, Salazar complained to supervisor Janet Rivera. *Id*. Defendants say the Union never grieved a claim by Salazar, and Salazar never brought a complaint of discriminatory treatment or harassment to the Ferraras' attention. Def. Rule 56.1 Stmt. ¶ 6. Brian Ferrara testified there was no formalized procedure at Ferrara Brothers for making complaints about discrimination. Salazar Aff. Ex. N (Brian Ferrara Dep.) 25:20-23.

On January 11, 2008, Salazar received a written warning from Ferrara Brothers for failing to follow a customer's instructions. Def. Ex. J (written warning). Then, on August 3, 2009, Salazar was suspended for sleeping on company time. The Union did not grieve either disciplinary action, and Salazar wrote an apology about the sleeping incident. Def. Rule 56.1 Stmt. ¶¶ 7-8.

On May 31, 2011, Ferrara Brothers terminated Salazar's employment because he was absent without leave for two weeks. The Union grieved the termination, and Ferrara Brothers and the Union resolved the grievance by entering into a "Last Chance Agreement" with Salazar. Under the agreement, Salazar received only a suspension and agreed to refrain from filing claims or actions related to the termination. Def. Rule 56.1 Stmt. ¶ 9. The Last Chance Agreement said that any further misconduct or wrongdoing, meaning any violation of the company's policy or rules, would result in Salazar's immediate discharge without prior warning. *Id*. ¶ 10. Salazar was not able to go to work for two weeks because he was detained by United States immigration officials for an immigration matter that was subsequently resolved. Salazar's attorney wrote to Ferrara Brothers and explained that Salazar's absence was not within his

3

control. Pl. Rule 56.1 Stmt. ¶ 9. Salazar says that after he was restored to employment, Joseph Ferrara was upset and told Salazar that he was going to "keep his eye" on Salazar. Salazar Aff. ¶ 11.

    2.    *Salazar's Termination*

On March 12, 2012, Ferrara Brothers terminated Salazar's employment. Def. Rule 56.1 Stmt. ¶ 11. Defendants say the termination was due to Salazar's violation of the Last Chance Agreement (id.), but Salazar asserts that the termination was the "culmination of the discriminatory scheme engaged in by Defendants." Pl. Rule 56.1 Stmt. ¶ 11. The parties agree that at some point, Joseph and Brian Ferrara learned that a piece of equipment was missing, which Salazar said was an air sensor. They agree the air sensor was owned by an outside party and was used to perform environmental testing. Def. Rule 56.1 Stmt. ¶ 12; Pl. Rule 56.1 Stmt. ¶ 12.

The defendants' version of events is that several employees tried to locate the missing equipment after Joseph and Brian Ferrara were told it was missing, and the next day the Ferraras learned that Salazar was seen by another employee (and captured on video) handling the equipment. Salazar denied any knowledge of the equipment even after being questioned twice by Annunziata and then again by dispatcher Hyorki Valderrama after he showed Salazar the video footage. Defendants say that at the end of the second day the equipment was missing, the Ferraras learned that Salazar pulled his truck up to the dispatch office and returned the equipment to Valderrama. Def. Rule 56.1 Stmt. ¶¶ 13-17. Valderrama, who is also Latino, said that Salazar's race or national origin played no role in the decision to fire him. Def. Ex. E (Valderrama Aff.) ¶ 9.

Salazar advances a different version of events. He agrees that at some point the Ferraras learned the air sensor was missing. Salazar says that on March 5, 2012, he found an item laying the Ferrara Brothers' yard right in front of where he parked his truck. He tried to return the item to the office but did not have time before he was called to go to his next assignment, so he put the equipment in the cab of his truck. The next day, he was questioned by Annunziata and shown video footage by Valderrama, but the defendants' description of the missing equipment varied, and they sometimes described the equipment as blue, sometimes yellow, and sometimes they referred to it as a box. Salazar says he was confused by the description of the item, but nevertheless he turned in the piece of equipment he found. *See* Pl. Rule 56.1 Stmt. ¶¶ 13-17; Salazar Aff. ¶¶ 16-18, 21. Salazar says that the other employees accused him of taking the air sensor, but he explained to them that he had found it and stored it in his truck until he could return it. Salazar Aff. ¶ 22.

Defendants concluded that Salazar violated the terms of the Last Chance Agreement because of the missing equipment and denying knowledge of its whereabouts. Joseph and Brian Ferrara agreed that terminating Salazar's employment was the appropriate result. Def. Rule 56.1 Stmt. ¶ 18. Salazar says that he was terminated as a result of the defendants' discriminatory conduct. Pl. Rule 56.1 Stmt. ¶ 18. Despite the fact that Salazar returned the missing equipment, the defendants made a criminal complaint against him for grand larceny and other charges. Salazar Aff. ¶ 25. Salazar was detained for 26 hours related to those charges. *Id*. Employee Peter Montella also made statements to the police in furtherance of the report. *Id.*, Salazar Ex. L (Criminal Complaint, dated March 19, 2012).

3.  *The Allegations of Discriminatory Conduct*

Salazar, a Hispanic male, immigrated to the United States from Ecuador. Salazar Aff. ¶ 1. Salazar states that Ferrara Brothers engaged in pervasive discrimination against Hispanics and other minorities, and in doing so it created a hostile work environment. Salazar says that the defendants referred to him a "spic" or "dirty Hispanic." *Id*. ¶ 4. He says that during his employment there were no female drivers, and at the time he was terminated there were only three male minority employees, down from approximately eight. He says that five other minority employees were terminated for illegitimate reasons. *Id*. Salazar says Operations Manager Brian Ferrara treated him differently because of his English-language skills and did not give him overtime. Pl. Rule 56.1 Stmt. ¶ 20; Salazar Aff. ¶ 5. Another worker, Charlie Castoro, also used racial slurs towards him because Salazar—instead of "another Italian person"—got to use a particular truck. He also suffered discrimination from a supervisor named John. Salazar Aff. ¶ 7. He says that the discrimination at Ferrara Brothers was so pervasive that upper management would have been aware of it. Pl. Rule 56.1 Stmt. ¶ 20.

Ferrara Brothers asserts that Salazar does not claim that either Joseph or Brian Ferrara has ever exhibited bias against Hispanic employees. Def. Rule 56.1 Stmt. ¶ 20.

4.  *Annunziata's Role*

According to Salazar, Annunziata used derogatory language towards Salazar and called him a "spic," "immigrant," and "Hispanic mother-fucker" in the presence of other employees, but he did not use derogatory terms towards white employees. Salazar Aff. ¶¶ 6, 12. Annunziata denies using any derogatory terms toward Salazar. Annunziata Aff. ¶ 13.

Salazar says that Annunziata played a quasi-supervisory role at Ferrara Brothers. According to Salazar, Annunziata "maintained constant contact with upper management" and

6

received instructions that he relayed to the drivers. Drivers also reported issues to Annunziata to be raised with management. Salazar claims that management enlisted Annunziata's assistance to verbally terminate Salazar's employment, since Annunziata ultimately told Salazar he was terminated and directed him to leave the property. Pl. Rule 56.1 Stmt. ¶¶ 21-22; Salazar Aff. ¶ 13. For these reasons, Salazar believed Annunziata was a supervisor. *Id*.

Defendants say that Annunziata had no involvement in the decision to terminate Salazar. They say that Annunziata is a driver and not a manager or supervisor, and Annunziata had no authority to hire, fire, or discipline Salazar. Def. Rule 56.1 Stmt. ¶ 21. Annunziata is a union shop steward, which meant that he was elected by the Union members to be their representative in the Union's dealings with Ferrara Brothers. *Id*.

## DISCUSSION

A.  *Standard of Review*

A court may grant summary judgment if the moving party shows that "there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law." *See* Fed. R. Civ. P. 56(a). "A fact is 'material' for these purposes when it 'might affect the outcome of the suit under the governing law.'" *Rojas v. Roman Catholic Diocese of Rochester*, 660 F.3d 98, 104 (2d Cir. 2011) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). A fact dispute is genuine "if 'the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Id.* (quoting *Anderson*, 477 U.S. at 248). "In deciding whether there is a genuine issue of material fact as to an element essential to a party's case, the court must examine the evidence in the light most favorable to the party opposing the motion, and resolve ambiguities and draw reasonable inferences against the moving party." *Abramson v. Pataki,* 278 F.3d 93, 101 (2d Cir. 2002) (citation omitted).

7

A judge's role at the summary judgment stage "is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Redd v. N.Y. State Div. of Parole*, 678 F.3d 166, 174 (2d Cir. 2012) (internal quotations and citation omitted). "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." *Id.* at 174 (internal quotations and citations omitted). "The court's role in deciding a motion for summary judgment is to *identify* factual issues, *not to resolve them.*" *Id.* (internal quotations and citation omitted) (emphasis in *Redd*). If the reasonable inferences drawn from the evidence could support a verdict for either side, summary judgment is unwarranted.

B.  *The Title VII Claims*

In assessing a defendant's motion for summary judgment on a Title VII claim, courts generally apply the burden-shifting framework first adopted by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *Ruiz v. Cnty. of Rockland*, 609 F.3d 486, 491 (2d Cir. 2010). Under that framework, the plaintiff bears the initial burden of establishing a prima facie case of discrimination. *Id.* This burden is not difficult to meet, as even a *de minimis* showing may be sufficient to establish a prima facie case. *Zimmermann v. Assocs. First Capital Corp.*, 251 F.3d 376, 381 (2d Cir. 2001).

If the plaintiff satisfies this initial burden, the burden shifts to the defendant to offer a legitimate nondiscriminatory reason for its action. *Ruiz*, 609 F.3d at 492. If the defendant provides such a reason, summary judgment can still be denied if the plaintiff can show that the defendant's proffered reason is a pretext for discrimination. *See United States v. Brennan*, 650 F.3d 65, 93 (2d Cir. 2011); *Ruiz*, 609 F.3d at 492. To show pretext, a plaintiff is not "required to prove the employer's stated justification was asserted with intent to deceive or in

bad faith"; rather, he must simply show that "discrimination played a role in an adverse employment decision." *Henry v. Wyeth Pharm., Inc.*, 616 F.3d 134, 157 (2d Cir. 2010).

Because NYSHRL claims are subject to the same standard as Title VII claims, I will consider them together, except where otherwise noted. *Patane v. Clark*, 508 F.3d 106, 113 (2d Cir. 2007); *see also Fanelli v. New York*, No. 13-CV-06627(ADS)(WDW), 2014 WL 4160318, *9 (E.D.N.Y. Aug. 18, 2014) (same).

1. *Prima Facie Case*

To establish a prima facie case of employment discrimination, "a plaintiff must show that (1) he is a member of a protected class; (2) he was qualified for the position he held; (3) he suffered an adverse employment action; and (4) the adverse action took place under circumstances giving rise to the inference of discrimination." *Dupree v. UHAB-Sterling St. Hous. Dev. Fund Corp.*, No. 10-CV-1894(JG)(JO), 2012 WL 3288234, *4 (E.D.N.Y. Aug. 10, 2012) (quoting *Ruiz*, 609 F.3d at 491–92). Here, the defendants do not contest that Salazar has satisfied the first three elements of his prima facie case. However, they argue that he has failed to establish that his termination occurred in circumstances giving rise to an inference of racial discrimination.

An "[i]nference of discrimination is a flexible standard that can be satisfied differently in differing factual scenarios . . . [and] [n]o one particular type of proof is required . . . ." *Barella v. Vill. of Freeport*, 16 F. Supp. 3d 144, 162 (E.D.N.Y. 2014) (internal quotations and citations omitted). To establish the fourth element, "an employee may rely on evidence of discriminatory comments made to an employee by a supervisor who had influence in the decision-making process." *Quinones v. Atl. Hyundai*, No. 06-CV-1626(TLM)(ARL), 2010 WL 681671, *2 (E.D.N.Y. Feb. 25, 2010) (finding plaintiff established a prima facie case by showing

9

manager made and tolerated discriminatory remarks) (citing *Rose v. New York City Bd. of Educ.*, 257 F.3d 156, 162 (2d Cir. 2001)).

Salazar has presented sufficient evidence from which a jury could reasonably find that his termination was at least partially the result of racial discrimination. Essentially, he has said that he has been subjected to racial slurs and treated differently—including by his supervisors—because of his status as a Hispanic employee. *See* Salazar Aff. ¶¶ 4-8. Then, when he came back to work on a Last Chance Agreement, the defendants were upset with his reinstatement and said they would "keep an eye" on him—a situation that only worsened the environment for Salazar. *See id.* ¶¶ 11-12. Finally, when Salazar found a piece of missing equipment and returned it to the office as soon as he was able to, he was painted as having stolen the equipment, fired, and even criminally charged for it. *See id.* ¶¶ 15-26. Defendants dispute this description of the events leading to Salazar's termination. But after viewing the evidence in the light most favorable to Salazar, I conclude that a rational jury could find that this evidence raises an inference of racial discrimination.

2. *The Defendants' Non-Discriminatory Reason and Evidence of Pretext*

Because Salazar has stated a prima facie case, the burden shifts to the defendants to produce a "legitimate nondiscriminatory reason" for the challenged employment decision. *Quinones*, 2010 WL, at *3 (quoting *Texas Dep't of Comm. Affairs v. Burdine*, 450 U.S. 248, 254 (1981)). The defendants argue that Salazar's violation of the Last Chance Agreement was a legitimate reason for his discharge. Def. Br. 9. Indeed, as recognized in the cases cited by the defendants, a violation of such an agreement provides a legitimate reason for an employee's discharge. *See, e.g.*, *Klaper v. Cypress Hills Cemetery*, No. 10-CV-1811(NGG)(LB), 2014 WL

1343449, *7 (E.D.N.Y. Mar. 31, 2014) (violation of last chance agreement is legitimate reason for termination under *McDonnell Douglas* framework), *aff'd*, 593 F. App'x 89 (2d Cir. 2015).

To avoid summary judgment after the defendants have set forth a nondiscriminatory reason for the discharge, Salazar must point to evidence that would be sufficient to permit a rational factfinder to conclude that the "employer's reason is pretextual and that it masks the employer's true discriminatory reason." *Barella*, 16 F. Supp. 3d at 159. If plaintiff can put forward evidence of events leading to his termination that calls the defendants' account of those events and reason for firing plaintiff into question, that may be enough to survive summary judgment. *See Quinones*, 2010 WL, at *3 (establishing factual dispute over whether defendant put forward a fabricated account of alleged threat as part of stated basis for plaintiff's termination); *see also Barella*, 16 F. Supp. 3d at 166 ("A plaintiff is not required to show that the employer's proffered reasons were false or played no role in the employment decision, but only that they were not the only reasons and that the prohibited factor was at least one of the 'motivating' factors.") (quoting *Holcomb v. Iona Coll.*, 521 F.3d 130, 138 (2d Cir. 2008)).

Salazar has presented evidence sufficient for a jury to infer that Ferrara Brothers' stated reason for firing him is a pretext, and that they were motivated by a discriminatory purpose. First, Salazar has presented evidence of Ferrara Brothers' hiring practices, which shows they employ mostly white males, and all but a small number of supervisors and managers are white males. *See* Salazar Aff. Ex. B (EEO-1 Worksheet). Although there is some discrepancy in the data regarding how many employees Ferrara Brothers had during the relevant time period and how many minority employees they hired and fired, the EEO-1 Worksheet

supports the argument that there was a mostly white environment at work where minority employees were mostly supervised by white males.

Second, Salazar has presented evidence that he has suffered from discrimination because of his race, including discrimination by those with decision-making authority over him.[2] Salazar testified in his deposition that he experienced discrimination from supervisor Brian Ferrara (Salazar Aff. Ex. C (Salazar Dep.) at 36:23 – 37:9), a supervisor named John (id. at 38:14 – 40:11), and supervisor Joseph Ferrara (id. at 42:17 – 45:6). Salazar also testified that Annunziata made discriminatory remarks towards him. *Id*. at 48:1 – 49:2. Even though Annunziata may not have been a formal supervisor, Salazar has at least created a question of fact as to Annunziata's actual role within the company. *See* Def. Rule 56.1 Stmt. ¶ 21, Salazar Aff. ¶ 13. Indeed, Annunziata communicated Salazar's termination to him (Salazar Aff. Ex. H (Annunziata Dep.) at 62:7 – 19), and Salazar believed he was a supervisor. Salazar Aff. ¶ 13. All of these facts, taken together and viewed in the light most favorable to Salazar, suggest that those with authority over him made discriminatory remarks towards him and treated him in a discriminatory manner.

Finally, Salazar has raised a factual dispute regarding the discrete facts leading to his termination. Viewing the events surrounding Salazar's termination in the light most favorable to him, Salazar found a piece of equipment near his truck, tried to return it immediately but could not, but then returned it as soon as he was able. Moreover, in Peter Montella's deposition, he said that he thought Salazar had just moved the equipment out of the way, and was not stealing it. Salazar Aff. Ex. K (Montella Dep. 17:16 – 18:22). The defendants point out that the investigation was "led by" Hyorki Valderrma, a Hispanic employee, whom Salazar does not

---

[2] I agree with Salazar's position that because the alleged discriminatory acts occurred throughout Salazar's employment at Ferrara Brothers, the "similarly situated employees" cannot be limited to those who were on a Last Chance Agreement. *See* Pl. Br. 11.

12

accuse of bias. Def. Br. 11. This fact may help the defendants persuade a jury, but it hardly justifies a determination as a matter of law that no discrimination occurred. The defendants also argue that because the same person hired and fired Salazar, that weakens Salazar's case. Def. Br. 12-13. Again, this fact weighs against Salazar, but it is only one factor among many and does not negate Salazar's prima facie case. *See Quinones*, 2010 WL, at *2 (same actor inference is one factor weighing against plaintiff's case).

Assuming as I must that Salazar's version of the events is true, he has put forward evidence that would allow a jury to find that the performance issue on which defendants rely was not the real reason for firing Salazar, but discrimination was. *See Dupree*, 2012 WL, at *10 (it was reasonable for jury to find discrimination was the real reason for plaintiff's termination). For these reasons, the defendants' motion for summary judgment on Salazar's wrongful termination claim is denied.

3. *The Hostile Work Environment Claim*

The defendants argue that Salazar's hostile work environment claim should fail because Salazar failed to exhaust administrative remedies and Ferrara Brothers cannot be liable for Salazar's co-workers' misconduct.

The defendants point out that Salazar did not file an EEOC complaint with respect to his hostile work environment claim. Def. Br. 15. Prior to bringing a suit under Title VII, a plaintiff must pursue administrative remedies by filing a complaint with the EEOC. *Deravin v. Kerik*, 335 F.3d 195, 200 (2d Cir. 2003). "We have recognized, however, that claims that were not asserted before the EEOC may be pursued in a subsequent federal court action if they are reasonably related to those that were filed with the agency." *Id.* (internal quotations and citation omitted). Claims are considered "reasonably related" if "the conduct complained of would fall

13

within the scope of the EEOC investigation which can reasonably be expected to grow out of the charge of discrimination." *Mathirampuzha v. Potter*, 548 F.3d 70, 76 (2d Cir. 2008) (internal quotations and citation omitted). The determination is fact-intensive, and a court should look to the allegations in the EEOC charge itself and the description of the discriminatory conduct. *See id.* (one isolated instance of aggression is not reasonably related to unrelated misconduct dating several years).

The EEOC charge here contains a description of (1) when Salazar was detained because of immigration removal proceedings and unable to report to work as a result, (2) how he entered into a Last Chance Agreement to save his job, (3) his employer's displeasure with him returning to work and their promise to "keep their eyes on him," and (4) how Salazar subsequently "suffered from a continued biased implementation of the rules" that culminated in his arrest after being accused of stealing the missing equipment. Def. Ex. Q (EEOC Charge of Discrimination) at 3. The charge further states that "[a]t around the time of [Salazar's] earlier dismissal (May 2011), Ferrara Corp. also systematically dismissed every other Black, Latino or Asian employee." *Id.* I conclude that the allegations of a "biased implementation of the rules," and of a systematic discharge of other employees, render the hostile work environment claim reasonably related to the claim for wrongful termination. The allegations of "repeated conduct" and the "cumulative effect" of the defendants' discriminatory acts are such that the defendants could have reasonably expected that a hostile work environment claim would be raised. *See Mathirampuzha*, 548 F.3d at 76-77.

Next, the defendants argue that Salazar's hostile work environment claim should fail on the merits because he does not allege that the misconduct was sufficiently severe and pervasive. Def. Br. 16. "To survive summary judgment on a claim of hostile work environment

14

harassment, a plaintiff must produce evidence that the workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment." *Aulicino v. New York City Dep't of Homeless Servs.*, 580 F.3d 73, 82 (2d Cir. 2009) (internal quotations, citation, and alterations omitted). Whether the challenge is sufficiently severe or pervasive depends on the totality of the circumstances; courts can consider factors including "(1) the frequency of the discriminatory conduct; (2) its severity; (3) whether the conduct was physically threatening or humiliating, or a mere offensive utterance; (4) whether the conduct unreasonably interfered with plaintiff's work; and (5) what psychological harm, if any, resulted." *Id.* (internal quotations and citation omitted).

    In addition to discriminatory remarks made by supervisors, Salazar testified that many other employees used racial slurs and derogatory language, like Peter Montella (Salazar Ex. C at 40:19), Ralph (id. at 40:21-23), and Charlie Castoro (id. at 45:6-24). Salazar further testified that the environment was generally difficult for him because of his race; for example, he had to wait longer for truck repairs than non-minority workers. *Id.* at 71:8-15. For these reasons, he says, he was subject to "constant verbal harassment, and unequal treatment." *See* Pl. Br. 9-10.

    Salazar has also demonstrated that the hostile work environment can be imputed to the Ferrara Brothers. *See Jantz v. Emblem Health*, No. 10-CV-6076(PKC), 2012 WL 370297, *11 (S.D.N.Y. Feb. 6, 2012) ("Plaintiff must also produce evidence demonstrating that a specific basis exists for imputing the conduct that created the hostile environment to the employer.") (internal quotations and citation omitted)). He argues that the fact Ferrara Brothers had no set process for employees to make complaints about discrimination is indicative of a hostile work environment. Pl. Br. 10. This is supported by Brian Ferrara's deposition testimony. Salazar

15

Aff. Ex. N (Brian Ferrara Dep.) 25:20-23. Indeed, "[w]hen harassment is perpetrated by the plaintiff's coworkers, an employer will be liable if the plaintiff demonstrates that the employer either provided no reasonable avenue for complaint or knew of the harassment but did nothing about it." *Perry v. Ethan Allen, Inc.*, 115 F.3d 143, 149 (2d Cir. 1997). This weighs in favor of other employees' conduct being imputed to the Ferrara Brothers. *See Kotcher v. Rosa & Sullivan Appliance Ctr., Inc.*, 957 F.2d 59, 63 (2d Cir. 1992) ("We have stated that a plaintiff must prove that the employer either provided no reasonable avenue for complaint or knew of the harassment but did nothing about it.") (citation omitted).

I conclude that, if believed by the jury, Salazar's testimony that he was subjected to frequent racial slurs and offensive comments would support the inference that his working environment was "permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Jantz*, 2012 WL, at *10 (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993)). Though the issue is a close one, Salazar has presented troubling evidence of Ferrara Brothers employees' misconduct, and in my view that misconduct would permit a jury to infer the existence of the hostile work environment Salazar alleges. *See La Grande v. DeCrescente Distrib. Co., Inc.*, 370 F. App'x 206, 210–11 (2d Cir. 2010) (plaintiff stated a claim for hostile work environment based on race where a manager threatened him, called him "nigger," and made it "impossible" for him to return to work); *see also Clarke v. InterContinental Hotels Grp., PLC*, No. 12-cv-2671(JPO), 2013 WL 2358596, *10 (S.D.N.Y. May 30, 2013) (collecting cases).

For these reasons, the defendants' motion for summary judgment as to the Title VII claims and the NYSHRL claims against the Ferrara Brothers is denied.

4. *The Individual Defendants*

The defendants argue that even if Salazar's Title VII claims against Ferrara Brothers survive summary judgment, the claims against Annunziata and Joseph Ferrara should fail because Title VII applies to employers, and not individuals. Def. Br. 20. They are correct. *See Tomka v. Seiler Corp.*, 66 F.3d 1295, 1313 (2d Cir. 1995), *abrogated on other grounds by Burlington Industries, Inc. v. Ellerth*, 524 U.S. 742 (1998). Therefore, the Title VII claims against Annunziata and Joseph Ferrara are dismissed.

The NYSHRL claim against Joseph Ferrara, however, may proceed. "The NYSHRL allows for individual liability under two theories: (1) if the defendant has 'an ownership interest' in the employer or has 'the authority to hire and fire employees,' . . . and (2) if the defendant aided and abetted the unlawful discriminatory acts of others." *E.E.O.C. v. Suffolk Laundry Servs., Inc.*, No. 12-CV-409(MKB), 2014 WL 4920178, *23 (E.D.N.Y. Oct. 1, 2014) (quoting *Tomka*, 66 F.3d at 1317. Salazar has alleged that Joseph Ferrara—who undisputedly had the authority to hire and fire employees—has treated him in a discriminatory manner and tolerated others' discriminatory treatment of him. *See* Salazar Aff. Ex. C (Salazar Dep.) at 42:17 – 45:6. Moreover, he believed Joseph Ferrara's statement he would "keep his eye" on Salazar precipitated the events leading to his termination. This evidence is sufficient to allow the NYSHRL claim to proceed against Joseph Ferrara.

In contrast, there is no evidence that Annunziata, although he communicated Salazar's termination to him, had either an ownership interest in the company or the authority to hire and fire employees. Therefore, the NYSHRL claim against Annunziata is dismissed.

C.   *The NYCHRL Claim*

Salazar also asserts a claim under the NYCHRL, N.Y.C. Admin. Code § 8-107(1)(a) against all defendants.  In *Mihalik v. Credit Agricole Cheuvreux N. Am., Inc.*, the Second Circuit explained that NYCHRL claims must be analyzed "separately and independently from any federal and state law claims." 715 F.3d 102, 109 (2d Cir. 2013).  Moreover, claims brought under the NYCHRL must be construed "broadly in favor of discrimination plaintiffs, to the extent that such a construction is reasonably possible." *Id.* (quoting *Albunio v. City of New York*, 16 N.Y.3d 472, 477–78 (2011)).  To establish a NYCHRL claim, a plaintiff "need only demonstrate by a preponderance of the evidence that she has been treated less well than other employees because of her protected status." *Id.* at 110 (quoting *Williams v. New York City Hous. Auth.*, 872 N.Y.S.2d 27, 39 (2009)).  For the reasons discussed above, Salazar's NYCHRL claims against Ferrara Brothers may proceed.

Salazar's NYCHRL claims may also proceed as against Joseph Ferrara and Annunziata, as individual liability is permissible under this statute.  *See Dillon v. Ned Mgmt., Inc.*, No. 13-CV-2622, 2015 WL 427921, *11 (E.D.N.Y. Feb. 2, 2015) ("In order to hold an individual defendant liable for creating a hostile work environment under NYCHRL, evidence must show that the claim relates directly to the conduct and behavior of the individual.").  There is sufficient evidence showing discriminatory conduct by both Ferrara and Annunziata to allow the individual claims against them to be tried to a jury.

For these reasons, the defendants' motion for summary judgment on Salazar's NYCHRL claims is denied as to all defendants.

D.  *The Malicious Prosecution Claim*

Finally, the defendants argue that Salazar has not made out a claim for malicious prosecution. To state a claim under New York law for the malicious prosecution a plaintiff must show "(1) the initiation or continuation of legal action against him, (2) termination of the proceeding in his favor, (3) absence of probable cause to commence the proceeding, and (4) actual malice." *Hanly v. Powell Goldstein, L.L.P.*, 290 F. App'x 435, 439 (2d Cir. 2008) (quoting *Rivera v. City of N.Y.*, 836 N.Y.S.2d 108, 111–12 (1st Dep't 2007)).

The "initiation" of a criminal prosecution "may arise only after an arraignment or indictment or some other 'evaluation by a neutral body that the charges [were] warranted.'" *Silver v. Kuehbeck*, No. 05-CV-35(RPP), 2005 WL 2990642, at *5 (S.D.N.Y. Nov. 7, 2005) *aff'd*, 217 F. App'x 18 (2d Cir. 2007) (quoting *Stile v. City of New York*, 569 N.Y.S.2d 129 (2d Dep't 1991). Salazar does not allege that he was arraigned or indicted, or that an arrest warrant was issued by a magistrate judge. Without one of these steps, his claim for malicious prosecution must be dismissed. *See Stile*, 569 N.Y.S.2d at 131.

CONCLUSION

For the reasons stated above, the defendants' motion for summary judgment is denied as to the Title VII claims against Ferrara Brothers and granted as to the Title VII claims against Joseph Ferrara and Leonardo Annunziata. Defendants' motion is denied as to the NYSHRL claims against Ferrara Brothers and Joseph Ferrara and granted with respect to the NYSHRL claims against Annunziata. The motion for summary judgment as to Salazar's NYCHRL claims is denied. Finally, the motion as to Salazar's malicious prosecution claims is granted against all defendants.

So ordered.


John Gleeson, U.S.D.J.

Dated: April 6, 2015
Brooklyn, New York